John R. SEK

v.

BETHLEHEM STEEL CORPORATION.

Civ. A. No. 74-977.

United States District Court,
E. D. Pennsylvania.

Oct. 26, 1976.

John R. Sek, pro se.

Arthur R. Littleton, Marc J. Sonnenfeld, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

### INTRODUCTION

CLARY, Senior District Judge.

This suit is brought by a Polish-American against Bethlehem Steel Corporation claiming violation of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, to be free from national origin and race discrimination in employment. He seeks injunctive relief as well as reinstatement, back-pay and damages.

The case is the unfortunate result of a collision between a strong-willed young man and a large industrial organization. The plaintiff, John R. Sek, is the third generation of his family to work for Bethlehem Steel. His grandfather served for 50 years as a "rougher" and his father has some 30 years of service as a highly-skilled welder with Bethlehem.

Mr. Sek himself graduated from Seton Hall University in 1965 and obtained a Mas-

ters Degree in Public Administration from Pennsylvania State University in 1967. He applied for and received an offer of employment as a trainee in Bethlehem's Industrial Relations Department, which he accepted. He began work on July 5, 1967. Up to this point, the story of Mr. Sek and his family is a tale familiar to many "hyphenated American" families whose ancestors first reached these shores in the early years of this century. It is a tale of hard work producing gradually improving social and economic prospects with each succeeding generation.

The plaintiff accepted the position in the Industrial Relations Department, with reservations, and he asked to be considered for work in the Community Relations Department. Over the next few years, his interest in community relations work rose in proportion to the decline of his interest in industrial relations. Company records rated his performance as "above average" initially, but this declined to "average" by the end of a year and to "needs improvement" by the end of two years. At the end of three years, in June 1970, he was still rated "needs improvement", a substandard rating. During this period, company records also show that the plaintiff virtually barraged his superiors with requests to transfer to the Community Relations Department.

The plaintiff's superior during this period, William Groben, testified that the most serious deterioration in Mr. Sek's performance began in the latter half of 1968 after he was refused a transfer to community relations. Sometime in 1969, Mr. Sek's coworkers complained to Mr. Groben that the plaintiff was not carrying his share of the load. This led to a confrontation between Mr. Sek and Mr. Groben at which Mr. Sek admitted that he felt by doing a poor job in industrial relations he would be reassigned to community relations.

While Mr. Sek's status in the Industrial Relations Department stood in this posture, another young man, Woodrow E. Cooper, returned from military leave and began working in the department as a trainee in January of 1969. He was first rated as "below average," but in six months he moved up to "needs improvement" and in nine months to "average". By June of 1970, while Mr. Sek was rated "needs improvement" with the comment that he had a poor attitude and lacked industry, Mr. Cooper's ratings consistently were "average" with comments that he improved considerably, worked well with others and expressed interest in labor relations. In June of 1970, the records show he was considered "qualified for increased responsibility".

In October of 1970, the steel industry fell into an economic slump and Bethlehem's management decided to cut back on the company's labor force. This decision applied to the Industrial Relations Department as well as the rest of the company. As a result of a review of the performance of personnel in the department, Mr. Sek was terminated while Mr. Cooper was retained.

This was on November 27, 1970. Since that time, Mr. Cooper has continued to progress. He has been promoted at least once. For the year 1973 to 1974 he was rated "above average" with the potential for promotion to company headquarters. In short, the decision to retain Mr. Cooper instead of the plaintiff was a matter of business judgment which proved to be correct.

Were it not for the fortuitous fact that Mr. Cooper is Black while Mr. Sek is White, the plaintiff could not present an even colorable claim on this record. The plaintiff impresses me as being highly intelligent, but unfortunately he also is rather arrogant. I think this character trait, and not his race, is the real cause of his difficulties with Bethlehem Steel.

### FINDINGS OF FACT

1. Plaintiff, John R. Sek, is a White male of Polish descent. He graduated from Seton Hall University in 1965 and received a Masters in Public Administration from Pennsylvania State University in 1967.

2. By letter dated February 6, 1967, addressed to a William Reusch of the Industri-

al Relations Department of the defendant Bethlehem Steel Corporation, plaintiff expressed an interest in applying for a position in the Personnel Department in the home office of the defendant.

3. Plaintiff completed an application form on February 24, 1967, and was interviewed for possible employment. On the form, plaintiff described his interests as legislation, management development techniques and community relations. By letter dated March 7, 1967, Benjamin C. Boylston, then manager of personnel for Bethlehem, invited the plaintiff to join the "1967 Loop Course Class" for steel plant industrial relations. The "Loop Course Class" is a management trainee program. Persons who enter Bethlehem Steel's employment at this level are known within the organization as "loopers".

4. By letter dated March 11, 1967, plaintiff accepted the defendant's offer. However, he reiterated his desire to find placement in the "Personnel position involving Labor Legislation and Management Development" which he said was more compatible with his background. He asked to be reconsidered for that position.

5. On July 5, 1967, plaintiff began a four-to-five-week orientation period in the home office of the defendant. On or about July 30, 1967, he was assigned to the Industrial Relations Department at the defendant's plant in Bethlehem, Pennsylvania.

6. During all times relevant to this law suit, plaintiff's supervisor was Mr. William E. Groben, who then held the title of assistant management representative. The management representative, Mr. Groben's immediate superior, was John G. Davies. Plaintiff worked directly under Mr. Cyrus Schaeffer in the area of labor relations. Plaintiff's co-workers included Robert Myers, James Posh, Albert Albright, John Hammerick, and, later, Woodrow E. Cooper. Mr. Groben had regular contact with the plaintiff and with Mr. Schaeffer during the plaintiff's employment at Bethlehem.

7. Plaintiff's duties included processing grievances on appeal to the "Step 3" level of procedure as prescribed by the labor agreement in effect at the plant. This required investigation, fact-finding, and contract interpretation.

8. As a "looper" or technical trainee, plaintiff's payroll classification was "non-exempt". He was given to understand that when his training period ended, he would be given "exempt" status and a change of title. The length of the training period is indefinite, and there is no company policy in this regard. In general, however, "loopers" in the Industrial Relations Department achieved exempt status after about three years with the company. To attain exempt status is to be exempt from the provisions of the Fair Labor Standards Act, and to be ineligible for overtime pay. It is considered a promotion to attain exempt status.

9. Plaintiff's job performance was superior at first. For example, in March of 1968, he prepared a memorandum suggesting modifications in the grievance procedure some of which were later adopted. However, he began to deteriorate toward the latter part of 1968.

10. During this period, the plaintiff repeatedly expressed his desire to transfer into the Community Relations Department. In March of 1969, he was interviewed for a possible position in the Community Relations Department. However, when a vacancy opened up several months later, it was filled by another White male employee.

11. During this same period, in discussions with Mr. Groben, plaintiff indicated that he was not interested in labor relations work. Other individuals, including the plaintiff's father, contacted Mr. Groben, advising him that the plaintiff was unhappy with labor relations and asking if he could be transferred to another function.

12. As a result, Mr. Groben spoke to the plaintiff about a transfer within his own division. This was not agreeable to the plaintiff.

13. Some time prior to the plaintiff's termination, Charles Burford, a Black male employee, was transferred from labor relations in Bethlehem to labor relations in the Pottstown, Pennsylvania plant. This was

the same work for which the plaintiff had already expressed his dislike.

14. Plaintiff also was anxious about his failure to obtain exempt status. He approached Mr. Groben and Mr. Davies to determine what was required to become exempt. He was told he had to display an interest in his work.

15. As a result, the plaintiff took a Management Development Course in March of 1970. This is a 40-hour program for first-line supervisors taken on company time at no cost to the employees. Plaintiff was the only nonexempt employee enrolled in the course. He did well in the course, but since there were no vacancies, he was not promoted to a supervisory, or exempt, position.

16. The deterioration in the plaintiff's performance resulted from his frustration both in failing to secure a transfer to the Community Relations Department and in failing to achieve exempt status.

17. In early 1969, Cyrus Schaeffer and Robert Myers approached Mr. Groben and complained that the plaintiff was not carrying his share of the load of grievances. Mr. Groben was told that the plaintiff had been observed day-dreaming at his desk. Mr. Groben attempted to resolve the problem by making a chart which defined each employee's area of responsibility. The plaintiff was assigned to process grievances from the Blast Furnace, Fuel, Fabricating and the Alloy and Tool Steel Divisions. Woodrow E. Cooper was assigned to assist Messrs. Myers and Schaeffer.

18. Although the divisions to which the plaintiff was assigned grievances generated only five percent of the total, plaintiff felt that the fact that he was responsible for these divisions was all the more reason he should have been given exempt status. However, the document prepared by Mr. Groben identified as P–1 was designed to assist him in delineating zones of responsibility within his division, and was never an official part of the administrative operation of the Labor Relations Department.

19. In addition to creating dissension among the other employees, plaintiff's dis-

like for grievance investigation resulted in a substandard performance on his part. Investigations he prepared tended to be brief, argumentative, conclusory and not based on contract interpretation. For example, of forty-six grievances handled by the plaintiff, twenty-six were not investigated at all.

20. At various times, plaintiff was informed that his performance had deteriorated both by Mr. Groben and Mr. Schaeffer. Some time in 1969, plaintiff was confronted by Mr. Groben after Mr. Groben received the complaints about plaintiff's work from Messrs. Myers and Schaeffer. Plaintiff admitted that he was deliberately doing a poor job on grievance investigation in the hope that this would force a reassignment to community relations or personnel services. Mr. Groben advised the plaintiff that he could not recommend for transfer someone who did a poor job for him.

21. "Quarterly Reports on Loopers" are prepared on company forms at Bethlehem Steel during the first two years of a "looper's" employment. The company also maintains annual "Reports to the Vice President as to Looper's Progress". The information contained in these reports was supplied by Mr. Groben and was based on personal observation as well as conferences with his subordinates and superiors.

22. The first quarterly report on the plaintiff, dated October 1, 1967, rates his performance "average" with a potential for increased responsibility. A comment states that the plaintiff told his superiors he was interested in the work.

23. The next quarterly report, on January 15, 1968, rated him "above average" with the comment that he was "making good progress" and "making an effort to learn as quickly as possible his present assignments." The reports dated April 4, 1968 and June 28, 1968 also rated him "above average".

24. On the report dated October 1, 1968, plaintiff was rated "average". It states he had the potential for advancement but needed more experience. It states that he requested a transfer to the Community Relations Department. This same report indi-

cates the plaintiff was promoted from "looper" to "technical assistant" on July 1, 1968, with a corresponding pay increase.

25. The quarterly report on the plaintiff dated January 7, 1969, rates him "average" and states he was making an effort to learn and continued to progress.

26. Woodrow E. Cooper is a Black male. He graduated from Lehigh University in 1968 with a Bachelor's Degree in Economics. He was employed by the defendant at the Bethlehem plant in the Industrial Relations Department. He began as a "looper" on July 12, 1968 to perform essentially the same function as the plaintiff. He went on military leave and was not rated on either the quarterly or annual reports until April 7, 1969.

27. A comparison of the performance ratings of the plaintiff with Mr. Cooper reveals that while the plaintiff was deteriorating, Mr. Cooper's performance was on the rise.

28. On April 7, 1969, the plaintiff was again rated average. The evaluation states he continued slow progress, and that he indicated an interest in community relations. The report adds, "Has not expressed interest in broadening his understanding of division activities."

29. On the June 1, 1969 report to the vice president, plaintiff is rated "needs improvement". His requests for transfer are again noted. The report adds he needs additional plant experience. A "needs improvement" rating means that the work is satisfactory in most respects but with significant weaknesses indicating improvement required in the present position.

30. On the June 1, 1970 report to the vice president, the plaintiff is again rated "needs improvement". While the report states he has potential for advancement, it goes on to state that it is impossible to determine his strengths "because of his indifferent attitude toward his work." His weaknesses are listed as lack of interest in work assignments and lack of industry and his attitude toward constructive criticism. He again expressed his dissatisfaction with his nonexempt status and his desire to transfer.

31. On the "Looper Exit Interview" dated December 12, 1970 it states: "Employee advised periodically of need to improve interest and industry in assignments. Advised also of poor attitude toward some fellow employees who attempted to correct his deficiencies. He has indicated a dislike for labor relations work claiming the field is too narrow. Continued lack of interest and application has demonstrated no potential for advancement."

32. The quarterly report on Mr. Cooper dated April 7, 1969 rates him "below average". In this same period, plaintiff was rated "average". The report on Mr. Cooper goes on to state that he expressed interest in the work but was slow in output. It adds that because of his having only three months on the job, it was difficult to evaluate his progress accurately.

33. The annual report, on June 1, 1969, rated Mr. Cooper as "needs improvement", the same rating given the plaintiff on that date. The report added that he should be retained in his present activity, that he was improving but needed more plant experience. It further stated that since he had only seven months experience, it was too early to determine his interests.

34. The quarterly report on Mr. Cooper dated September 9, 1969, rated him average. It went on to state: "His work efforts have improved considerably both in quantity and quality. Continues to express interest in his assignment. Works well with others in the department and with Union representatives." The quarterly reports for December 3, 1969, and March 9, 1970 were essentially the same, rating him average, noting continued improvement, interest and ability to work with others.

35. In the annual report dated June 1, 1970, when the plaintiff was rated "needs improvement" with a poor attitude, Mr. Cooper was rated average and his strengths were stated to be in the areas of fact-finding ability and interest in the work. With respect to needed improvement, areas listed

were plant operations experience and quality of work.

36. Defendant's performance appraisal for Mr. Cooper covering the period from January 1, 1971 until December 31, 1971, after the plaintiff had been terminated, rated him average and states that the quality and quantity of his work were satisfactory. The report also stated he needed further training and was dedicated to his work. The performance appraisal for February 1972 to June 1972 also rated him average but added that he was well organized, willing to learn, enthusiastic and a good candidate for promotion with good long range potential.

37. The performance appraisal for the period June 1972 to June 1973 rated Mr. Cooper "satisfactory", the equivalent of average. It adds that he was "well rounded", was gaining confidence, was enthusiastic and had a good rapport with his supervisors. He was said to be an excellent candidate for promotion to the home office.

38. The performance appraisal for the period June 1973 to June 1974 rates Mr. Cooper "above average." It goes on to say that he is "very enthusiastic and capable"; is "well organized"; has "exceptionally good rapport with Plant Supervisors and co-workers"; is "very innovative"; is a "self-starter". He is said to be an excellent candidate for promotion to the home office.

39. To summarize, while the plaintiff began as an above average employee, his performance as appraised by his superiors gradually degenerated until it was substandard. In addition, his attitude toward his work and his supervisors and co-workers was poor by the time of his termination. At the same time, Mr. Cooper's performance, initially rated below average, improved to average and was superior to the plaintiff's performance at the time of the plaintiff's termination. In addition, Mr. Cooper's records show that he consistently had a good attitude toward his work and worked well with his supervisors and co-workers. Moreover, Mr. Cooper's performance continued to improve in the succeeding

years, and he achieved exempt status after about three years of service.

40. Anthony D. Williams, a Black male was hired July 7, 1969, as a "looper" in the Personnel Department. He received an unsatisfactory rating in the June 1, 1970, annual report to the vice president. He was also denied a merit increase and had requested a transfer to the home office for college recruitment. The report states he was advised of his shortcomings including absenteeism, lack of motivation, and bad attitudes toward supervisors and co-workers. He was again rated below average in the September 10, 1970 quarterly report. He was placed on probation and received a disciplinary warning.

41. Benjamin Boyleston, personnel manager during the time the plaintiff was employed at Bethlehem, stated that while minority groups are not treated differently with regard to hiring and promotions, Bethlehem did have an affirmative action program. The program appears to have focused on recruitment efforts at predominantly Black colleges. In addition, pursuant to Executive Order 11246 for federal contractors, Bethlehem set up written guidelines and a review procedure to help insure that minority group members, once hired, were fairly considered for promotions. While there was an effort to increase minority representation in the supervisory positions, there was no requirement to retain employees whose performance was considered inadequate.

42. Bethlehem also has a policy of notifying employees if their performance is substandard. This notice may be informal, through conferences with superiors, or it may be through a formal notice of probation. If the work force as a whole had to be reduced, however, employees whose performance was substandard would be terminated or laid off, and employees whose performance was up to par, would be retained if economic conditions permitted.

43. In October 1970, the entire steel industry experienced an economic slump. As a result, Bethlehem's management decided to reduce the company's work force, and

each plant and department was asked to review its personnel to determine where cuts could be made. At the Bethlehem plant alone, some one hundred-six salaried employees were laid off.

44. On November 27, 1970, both the plaintiff and Anthony Williams were terminated by the defendant as part of this program of general cut-backs. Woodrow Cooper was retained.

45. On November 16, 1970, John G. Davies addressed a memorandum to E. P. Gillette, assistant to the vice president, Steel Operations. The subject of the memorandum was the termination of the plaintiff. He cited the following reasons for the termination:

(1) His repeated requests for transfer indicated a lack of interest in labor relations;

(2) His desire for a transfer had an adverse effect on his performance, his attitude toward both his work and his co-workers, and his effectiveness within the unit;

(3) He failed to progress in the areas of problem solving and effective handling of labor relations matters.

46. The memorandum also describes the exit interview with the plaintiff held the same day. According to the memorandum, the plaintiff complained about Mr. Schaeffer, his immediate superior, claiming he had limited ability and was ineffective as a leader. He complained that his duties were not clearly defined. He complained that he was unfairly treated in not having been given exempt status. He stated that he felt grievance investigation was too narrow a field for him and he desired broader responsibilities such as those in a position called "instructor in the Steel Management in Action program." He stated he would not accept the decision to terminate him without appeal to the Union, to Lewis Foy, Chairman of the Board of Bethlehem, whom he considered a personal friend because of a prior relationship with his daughter, and to the "Federal government in the form of a charge of discrimination." He felt that, because he was not the most jun-

ior member of the department, he should be retained in favor of someone with less seniority. Finally, he felt that there was a personality clash between Mr. Groben and himself and as a result the decision to terminate him was not made objectively.

47. Plaintiff did appeal his discharge to Mr. Foy, who told him that he delegated authority for these decisions to his, the plaintiff's, superiors and that he, Foy, would support their determination.

48. Plaintiff thereafter filed charges of unlawful employment discrimination and retaliation against the defendant with the Equal Employment Opportunity Commission (EEOC). On February 14, 1974, the EEOC found no reasonable cause to credit the plaintiff's allegations. The findings of the EEOC were in no way influenced by the defendant.

49. The EEOC also found that the co-workers, supervisors and executives who came into contact with the plaintiff generally agreed that he was "moody", "headstrong", "unreceptive to criticism" and "consumed with frustration at his failure to achieve exempt status."

50. The EEOC also found that there was no company policy of awarding exempt status, and a review of the defendant's records showed variations from zero to fifteen years.

51. Plaintiff received severance benefits in accordance with company policy. At the exit interview on November 16, 1970, plaintiff was told he had two options. He could accept a severance allowance based on his rate of pay and years of service payable for a number of weeks. Alternatively, he could go on lay-off status without recall, whereby he would be eligible for unemployment compensation from the Commonwealth of Pennsylvania in addition to supplemental unemployment benefits from the defendant. When plaintiff refused to choose between these two options, Mr. Groben processed the first one, the severance allowance. Plaintiff then refused the severance check and asked to be placed on lay-off status. Thereafter, the plaintiff received unem-

ployment compensation as well as supplemental benefits for about one year.

52. The overwhelming weight of credible evidence, especially the oral testimony of Mr. Groben and the findings of the EEOC, show that no employment action was taken by the defendant with respect to the plaintiff because of his race or national origin, or for any other unlawful reason.

53. Specifically, the defendant did not refuse to transfer the plaintiff because of his race or national origin. The position he sought was given to another White male. Charles Burford, the Black male who was transferred, was offered a position for which the plaintiff had already expressed his dislike.

54. The defendant did not discriminate between the plaintiff and Anthony Williams with regard to probation. In the first place, the plaintiff was notified informally that his performance was below par. In the second place, there was no policy of notifying employees that their performance was unsatisfactory exclusively by the device of probation. In the third place, neither the plaintiff nor Mr. Williams were discharged for cause. They were discharged because economic conditions required a general cut-back in the work force, and therefore employees who were less desirable were let go.

55. Finally, the defendant did not discriminate against the plaintiff in favor of Woodrow Cooper because of their respective races. The defendant's records consistently described the plaintiff as having difficulty working with others, and they just as consistently described Mr. Cooper as working well with others. The EEOC made similar findings with respect to the plaintiff. Thus, even if the respective performance of the two men is disregarded, the most the evidence shows is that the plaintiff was discharged because his superiors did not like him. But the weight of the evidence also shows that the defendant had objective reasons for its action, i. e., the poor performance of the plaintiff in contradistinction to the steady improvement of Mr. Cooper. The same racially neutral factors, attitude and performance, were the basis for the denial of exempt status to the plaintiff while Mr. Cooper achieved exempt status after about three years.

56. Plaintiff's claim of discrimination was rejected by both the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission. In addition, plaintiff's own attorneys withdrew their appearance after concluding that the plaintiff would be unable to present a prima facie case, and after so advising the plaintiff.

57. Plaintiff's claim is frivolous, and his determination to press it in the face of the findings of the EEOC and his own attorneys is unreasonable, and vexatious.

## DISCUSSION

The plaintiff in this case claims rights against his former employer under Title VII of the Civil Rights Act of 1964, specifically under 42 U.S.C. §§ 2000e–2 and 3. He also has invoked the Fourteenth Amendment of the United States Constitution, which, of course, is inapposite for absence of state action.

The record is utterly devoid of any evidence of retaliation, pursuant to § 2000e–3, and therefore any rights the plaintiff has must be found in § 2000e–2(a) which provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Thus, Congress has required the removal of arbitrary barriers to employment when they operate to invidiously discriminate on the basis of a racial or other forbidden classification. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The act gives standing to majority group members, such as White males, as well as to minority groups.

McDonald v. Sante Fe Transportation Co., — U.S. ——, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The interest to be protected is the maintenance of efficient workmanship through fair and racially neutral employment and personnel decisions. *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, discriminatory preferences for any group based on the enumerated classifications is precisely and only what Congress has proscribed. *Griggs, supra* at 431, 91 S.Ct. 849. Thus, Congress did not outlaw discrimination *per se.* Employees are not protected by Title VII from the broad range of discretionary actions employers may lawfully take. Title VII provides relief only when an employer's conduct is based, at least partially, on one of the specifically forbidden factors such as race. But "an employer is not required to like his employees." *Bradington v. I.B.M.,* 360 F.Supp. 845, 854 (D.Md.1973), *aff'd,* 492 F.2d 1240 (4th Cir. 1974); *Green v. McDonnell-Douglas Corp.,* 318 F.Supp. 846, 850 (E.D.Mo.1970), *rev'd on other grounds,* 463 F.2d 337 (8th Cir. 1972), *remanded on other grounds,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In a Title VII suit, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. If he succeeds, the burden then shifts to the defendant to propound a legitimate reason for the discharge. *McDonnell-Douglas Corp. v. Green, supra* at 802, 93 S.Ct. 1817. And while it is said that the touchstone of legitimacy is "business necessity," *Griggs, supra* at 431, 91 S.Ct. 849, even subjective reasons for the employer's action will suffice if they are not pretextual, or artificial and arbitrary or discriminatory in application. *McDonnell-Douglas Corp. v. Green, supra* at 803–7, 93 S.Ct. 1817. But the defendant must prove by a preponderance of the evidence that its conduct was based on racially neutral policies and justifiable business judgment. *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3rd Cir. 1976).

It is far from clear that the plaintiff has succeeded in presenting a prima facie case.

*Olson v. Philco-Ford,* 531 F.2d 474, 478 (10th Cir. 1976); *Sime v. Trustees of Cal. State University & Colleges,* 526 F.2d 1112, 1113–4 (9th Cir. 1975). The only real evidence in support of the charges is innuendo fabricated out of the existence of an affirmative action program and the differing races of the plaintiff and Mr. Cooper.

However that may be, the defendant has shown by clear and convincing evidence that its conduct was based on legitimate business judgment executed in accordance with racially neutral policies, and criteria.

The evidence showed that the defendant fell upon a period of hard times in common with the entire steel industry. It became necessary to lay-off some employees to weather these conditions. The plaintiff was selected for discharge for both subjective and objective reasons—for his poor attitude and his poor performance. These are legitimate reasons which were not shown by the plaintiff to be pretextual, artificial, arbitrary or discriminatory in application.

Woodrow Cooper, the less senior Black male who was retained, was tested against the same criteria and, unlike the plaintiff, was not found wanting. He had a good work attitude and his performance was up to par. And since there is no evidence that Blacks or others were subsequently hired to perform the plaintiff's job in the same department, the decision to terminate the plaintiff can only be termed lawful and not in violation of the plaintiff's rights under Title VII.

Plaintiff's other contentions are without merit for the same reasons. Failure to place him on formal probation is simply irrelevant to this case. He was not discharged for cause. His position was eliminated because, under adverse economic conditions, the company found it could do without him. And even if the discharge was strictly speaking for cause, he had ample notice of his shortcomings from his superiors and co-workers. Similarly, the transfer he sought could not be effected at first because there was no vacancy in the Community Relations Department. Later,

a position in that department was offered to another White male. There is no evidence of a transfer being offered to a Black male under similar circumstances. As far as his failure to achieve exempt status is concerned, there is no evidence that exempt status was withheld for an undue length of time. The plaintiff was discharged after a little more than three years of service, and exempt status was usually not granted until at least three years expired. To the extent it was withheld, the reason was his lack of interest in the job, which is again racially neutral and not shown to be a pretext.

Title VII does not guarantee everyone a job. It leaves employers free to make reasonable business decisions as long as those decisions are made pursuant to policies and practices that are neutral with respect to race, color, religion, sex or national origin. In this case, the defendant's conduct has been found to be based on justifiable and necessary business judgment and devoid of unlawful discrimination, both in purpose and effect. The defendant is therefore entitled to judgment in its favor.

Finally, Title VII provides that the prevailing party may recover attorney's fees as part of the costs in the discretion of the Court. 42 U.S.C. § 2000e–5(k). "Prevailing party" includes defendant-employers. *U. S. Steel Corp. v. United States,* 519 F.2d 359, 364–65 (3rd Cir. 1975); *Van Hoomissen v. Xerox Corp.,* 503 F.2d 1131, 1133 (9th Cir. 1974).

In determining whether to exercise that discretion in favor of employers who successfully defend Title VII cases, the Court must weigh the interests of individual claimants who may be unable to bear the financial burden of asserting their Civil Rights against the interests of employers who must defend unreasonable, frivolous, vexatious and meritless actions. *U. S. Steel Corp. v. United States,* 385 F.Supp. 346, 348 (W.D.Pa.1974), *aff'd,* 519 F.2d 359 (3rd Cir. 1975); *EEOC v. Western Electric Co.,* 10 FEP Cases 1275, 1277 (D.Md.1975). And while attorney's fees should not be routinely awarded to Title VII defendants, where

the plaintiff's suit is prosecuted on highly questionable grounds, is abusive of the defendant's time and resources, and raises suspicions that the plaintiff is motivated by spite or by an intent to harass or embarrass the defendant, an award of attorney's fees is proper. *U. S. Steel Corp. v. United States, supra,* 519 F.2d at 364–65; *Carrion v. Yeshiva University,* 397 F.Supp. 852 (S.D. N.Y.1975); *Robinson v. KMOX–TV,* 407 F.Supp. 1272 (E.D.Mo.1975).

This case bears several indicia of unreasonable, abusive conduct. Plaintiff's claims were found to be baseless by both the Pennsylvania Human Relations Commission and the EEOC. His own attorneys withdrew their appearances and advised him they did not think he could present a prima facie case.

Substantial amounts of public funds were expended to insure that the plaintiff's rights were protected, to say nothing of the time and expense of his own counsel. When, in the face of the conclusions reached by these neutral parties, the plaintiff continued to press his claim, he assumed the risk that if he lost he would, at long last, have to face the consequences of his folly. For these reasons, I have concluded that an award of attorney's fees is proper in this case.

An order will issue directing the parties to confer and attempt to agree to reasonable attorney's fees in view of the financial circumstances of the plaintiff. If the parties cannot agree, attorney's fees will be fixed in further proceedings.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 2000e–5(f)(3).

2. The defendant's Quarterly Reports on Loopers, Reports to the Vice President as to Loopers Progress, and Annual Appraisal Reports were business records made in the regular course of business reflecting contemporaneous matters and therefore admissible under 28 U.S.C. § 1732.

3. Exhibit D–26 is admissible as a summary pursuant to Rule 1006 of the Federal Rules of Evidence.

4. The plaintiff has failed to establish by a preponderance of the evidence that the defendant failed to transfer him in accordance with his requests because of his race or national origin.

5. The plaintiff has failed to establish by a preponderance of the evidence that the defendant failed to place him on probation before discharge because of his race or national origin.

6. The plaintiff has failed to establish by a preponderance of the evidence that his discharge was motivated by racial or national origin discrimination.

7. The plaintiff's discharge was based on business necessity.

8. Plaintiff has failed to establish by a preponderance of the evidence that he was denied exempt status because of his race or national origin.

9. The plaintiff has failed to prove by a preponderance of the evidence that he has suffered loss of alternative employment opportunities or loss of professional reputation because of racial or national origin discrimination by the defendant.

10. Plaintiff is not entitled to back pay, reinstatement, nor to any injunctive relief as a matter of law.

11. The defendant did not violate any rights secured to the plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* including the right under 42 U.S.C. § 2000e–3 to be free of unlawful retaliation.

12. The defendant is entitled to judgment in its favor.

13. Defendant is entitled to an award of attorney's fees as part of the costs. 42 U.S.C. § 2000e–5(k).