**Elizabeth STEFANONI and Zachary Stefanoni, Plaintiffs,**

v.

**BOARD OF CHOSEN FREE-HOLDERS COUNTY OF BURLINGTON,**

and

**Burlington County Sheriff's Department,**

and

**Gary L. Daniels, Sheriff of Burlington County, Defendants.**

No. 99–CV–2754 (JAP).

United States District Court, D. New Jersey.

Jan. 15, 2002.

624

George D. Walker, Jr., Larry Pitt & Associates, P.C., Philadelphia, PA, for Plaintiffs.

Michael P. Madden, Madden, Madden & Del Duca, A Professional Corporation, Haddonfield, NJ, for Defendants.

## OPINION

PISANO, District Judge.

Defendants, who successfully moved this Court for summary judgment on plaintiffs' Title VII and NJLAD claims, now move for an award of attorney's fees under 42 U.S.C. § 2000e–5(k). Because the Court finds that plaintiffs' claims were without foundation and frivolous, defendants' motion for fees is granted.

## I. PROCEDURAL HISTORY

On June 15, 1999, Elizabeth Stefanoni ("Elizabeth") and her husband Zachary Stefanoni ("Zachary") sued defendants alleging sexual harassment and retaliation under both Title VII and the New Jersey Law Against Discrimination ("NJLAD"). Specifically, Elizabeth alleged that defendant Gary L. Daniels, Sheriff of Burlington County ("Sheriff Daniels"), sexually harassed her by touching her twice and making five compliments concerning her hair and perfume. Furthermore, both Elizabeth and Zachary brought retaliation claims alleging that the defendants investigated and ultimately terminated their employment in response to Elizabeth's filing of formal sexual harassment charges against Sheriff Daniels.

In an order dated September 21, 2001 the Court granted defendants' motion for summary judgment, and dismissed all of plaintiffs' claims with prejudice. Defendants' motion seeks reimbursement from plaintiffs of costs and fees paid by the Burlington County in the amount of $90,309.64.[1]

---

1. Plaintiffs have appealed the Court's order dismissing their claims. The Court retains jurisdiction to determine attorney's fees while the appeal is pending. *Nissim v. McNeil Con-* sumer Products Co., Inc., 957 F.Supp. 604, 605 n. 1 (E.D.Pa.1997); *Venen v. Sweet,* 758 F.2d 117, 120, n. 2 (3d Cir.1985).

## II. DISCUSSION

### A. Standard to Award Attorney's Fees

In Title VII and NJLAD litigation, the prevailing party may be entitled to an award of attorney's fees at the court's discretion. 42 U.S.C. § 2000e–5(k) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs"); N.J.S.A. 10:5–27.1 ("In any action or proceeding brought under this act, the prevailing party may be awarded a reasonable attorney's fee as part of the cost, provided however, that no attorney's fee shall be awarded to the respondent unless there is a determination that the charge was brought in bad faith."). Defendants rely primarily on Title VII in asserting their entitlement to fees.[2]

■ The standard for awarding attorney's fees under 42 U.S.C. § 2000e–5(k) to a prevailing defendant differs from that which applies to a prevailing plaintiff. While prevailing plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust," a prevailing defendant is only entitled to fees "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *EEOC v. L.B. Foster Co.,* 123 F.3d 746, 750 (3d Cir.1997) (quoting *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). Contrary to the NJLAD, Title VII does not require a finding of bad faith. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 502 (3d Cir.1991).

■ In *L.B. Foster,* the Third Circuit set forth several factors to consider in determining whether a fee award is appropriate to a Title VII defendant. They are: "(1) whether the plaintiff established a *prima facie* case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *L.B. Foster Co.,* 123 F.3d at 750–51. These factors are to be used as guidelines and not hard and fast rules, and determinations of frivolity are to be made on a case-by-case basis. *Id.* The *L.B. Foster* court noted that "[c]ases where findings of 'frivolity' have been sustained typically have been decided in the defendant's favor on a motion for summary judgment or a . . . motion for involuntary dismissal." *Id.* at 751. In addition, courts often look to other considerations specific to the facts before them to determine whether attorney's fees are warranted. *See Barnes Foundation v. The Township of Lower Merion,* 242 F.3d 151, 158 (3d Cir.2001) (setting forth a non-exclusive list of factors that courts have considered in awarding attorney's fees); *see also Whiteland Woods, L.P. v. Township of West Whiteland,* No. Civ.A.96–8086, 2001 WL 936490 at *5, (E.D.Pa. Aug.14, 2001) (factoring "other considerations" into its determination to award attorney's fees).

■ The Court is mindful that it must "resist the understandable temptation to engage in *post hoc* reasoning by conclud-

---

**2.** Although defendants do not focus their motion on the NJLAD, there is evidence on the record to suggest the plaintiffs' bad faith in initiating this litigation. Sheriff's Investigator Mark Herkoperec heard Elizabeth claim that she would sue for sexual harassment and fabricate stories about Sheriff Daniels if she were transferred to another unit. Defs.' Ex. 101. Another Sheriff's Department employee heard Elizabeth say she would sue for discrimination if Zachary was promoted over her of if she were transferred to the courts division. Defs.' Ex. 102. However, because the Court did not consider these statements in its prior opinion, the Court will rely exclusively on Title VII in its determination to award attorney's fees.

ing that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or with out foundation." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 502 (3d Cir.1991) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). In determining whether a suit is frivolous, "a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981). A detailed recitation of the facts upon which Elizabeth and Zachary based their claims is helpful in demonstrating that this case was unreasonable and baseless, and thus frivolous.[3]

### B. Factual Allegations of the Sexual Harassment Suit

#### 1. The Parties

Sheriff Daniels took office on January 1, 1996. As Sheriff, he was responsible for fifty seven officers and approximately fourteen clerical employees. The Sheriff's Department was divided into four units: the courts division, the crime prevention unit, the civil processing unit and the investigative unit. The investigative unit was further divided into the child support unit, the fugitive unit and the special investigative unit.

Elizabeth and Zachary began work at the Sheriff's Office on February 14, 1995. Within two months of meeting each other on the job, the two began an office romance.[4] Under Sheriff Daniels, Elizabeth was assigned to the child support unit, with occasional stints in the fugitive unit.

Zachary began his Sheriff's Department employment in the child support unit, but was transferred to the fugitive unit in June of 1996.

Defendants' troubles with plaintiffs began soon after Sheriff Daniels took office. In early 1996, the Sheriff Department's office manager brought to Sheriff Daniels's attention inconsistencies regarding the plaintiffs' time records. Defs.' Ex. G, 153:3–11; 155:16–20. Sheriff Daniels and Sergeant Vanderbilt reviewed plaintiffs' time records and determined that there were "serious problems with the record keeping." Apparently, "hours were logged in for times they were actually signed off." *Id.* at 155:21–25, 156:1–5. Although plaintiffs maintained they were entitled to some seventy hours of flex time, the Sheriff determined that he could not "in good conscience" provide them each with that amount. *Id.* at 161:13–23. The Sheriff compromised and gave plaintiffs thirty five hours each. *Id.*

Problems with Elizabeth's on-the-job behavior continued. Between January 1996 and September 1997, Elizabeth was counseled on numerous occasions by Undersheriff Stanfield and Sergeant Vanderbilt, her superiors, concerning her attitude as a member of the investigation section. *Id.* at 164:12–24. During one incident, Elizabeth agitated Sergeant Vanderbilt to the point that he packed up his belongings and left his office threatening to resign. Later, Elizabeth admitted to Undersheriff Stanfield that the incident was her fault.

### 2. First Incident of Alleged Harassment

On September 2, 1997, Elizabeth was summoned to jury duty in the Burlington

---

3. The facts recited herein are taken in their light most favorable to plaintiffs, as they were culled from the Court's opinion granting summary judgment. Defendants do not concede this version of events.

4. After their respective divorces, the plaintiffs were married in May of 1998.

County Courthouse. The Sheriff's Department is located in the same building. During a break, at approximately 11:00 a.m., Elizabeth stopped by the Sheriff's Department investigative unit office on the second floor. Upon exiting a nearby ladies' room, Elizabeth and the Sheriff met in the hallway.

Noting her juror's badge, Sheriff Daniels offered to have her excused from jury duty by telling the jury administrator that there was an impending raid that required Elizabeth's assistance. Plaintiff acquiesced even though, she maintains, that there was no such impending raid. The defendant then "reached over, removed a piece of hair from the side of [her] mouth, and brushed [her] breast." Defs.' Ex. C, 148:1–4. Plaintiff describes the Sheriff's brushing of her breast as "light," and estimates that the contact lasted "maybe a second." *Id.* at 203:6. Then, as the Sheriff turned to walk away, he stated "don't forget, you owe me." *Id.* Elizabeth contends that immediately thereafter, she exited the building extremely upset by the incident. However, she did not report the incident to anyone and continued to work at the Sheriff's Department.

### 3. Elizabeth's Misconduct and Transfer

On October 24, 1997 Elizabeth participated in an arrest while unarmed, violating Sheriff Daniels's explicit orders. New Jersey Attorney General Guidelines require law enforcement officials, against whom a domestic violence claim has been filed, to surrender their firearm until such time as the County prosecutor's office investigates the case and the officer undergoes a psychiatric evaluation. Under

these rules, Elizabeth was forced to surrender her firearm when her then husband, Mr. Wayne Brown ("Brown"), filed a New Jersey Civil Complaint and Temporary Restraining Order against her, in which he alleged she threatened kill to him. Defs.' Exs. 64, 65.

Sheriff Daniels allowed Elizabeth to remain active in the investigative unit even though she was prohibited from carrying her firearm. However, the Sheriff forbid Elizabeth from participating in fugitive arrests until she was again allowed to carry a gun. Defs.' Ex. G, 163:19–23. Both Elizabeth and Zachary testified that they understood that she was not permitted to participate in fugitive arrests unarmed. Defs.' Ex. E, 123:3–8. Despite this understanding, Zachary asked Elizabeth to assist him in arresting a fugitive. Defs.' Ex. D, 52:1–16. Unarmed, without handcuffs, and in violation of direct orders, Elizabeth assisted Zachary and another officer in the arrest of a fugitive.[5]

Immediately after learning of the incident, Sheriff Daniels met with Elizabeth and her supervisors on November 13, and again on November 14. At the meetings, Elizabeth admitted that she had participated in a fugitive arrest even though Sheriff Daniels had forbade her to do so. As a result, Sheriff Department authorities decided to transfer Elizabeth to the courts division. Defs.' Ex. G, 133:20–25; 134:1–7. Sheriff Daniels, Undersheriff Stanfield and Sergeant Vanderbilt felt such a transfer was necessary because they had "serious reservations regarding her judgment" given that she "violated a direct order not to engage in this type of activity, [and] that harm, grievous harm could have come to people out there." *Id.* It is on the heels of

---

5. The Prosecutor's Office also seized Zachary's firearm after his then wife filed a domestic violence complaint and temporary restraining order against him. Defs.' Ex. 17.

After psychiatric evaluation, Zachary was permitted to carry his gun during work hours only. Defs.' Ex. 9.

her transfer to the courts division that Elizabeth contends the second episode of sexual harassment occurred.

### 4. Second Incident of Sexual Harassment

On November 17, 1997, Elizabeth accompanied her son to the courthouse for his appearance on aggravated sexual assault charges. Defs.' Ex. D, 106:10–12. Brown, as the father of her son, also attended. By this time, the couple's relationship was no longer civil. In addition to the legal proceedings they had already instituted against one another, Elizabeth had recently revealed to Brown her relationship with Zachary. News of the affair prompted Brown to threaten to shoot Zachary. When Brown appeared at the courthouse, Sheriff Daniels had already taken the precaution of placing an armed watch outside Zachary's office.

The animosity between Elizabeth and Brown played out in the courthouse. Two Sheriff's officers had to stand between Brown and Elizabeth when he confronted her, blaming her for their son's legal problems. Defs.' Ex. G, 191:10–17. To maintain order and safety in the courthouse, Sheriff Daniels threatened to arrest Brown if he found him in the administrative or investigation section of the Sheriff's Department.

After the confrontation between Elizabeth and Brown, Sheriff Daniels asked to speak with her in a nearby conference room. Once inside and seated, Sheriff Daniels explained that Brown had threatened to kill Zachary. The Sheriff also explained that, per their November 14th meeting, Elizabeth was to report to the courts division but could return to the investigative unit once the Department had an opportunity to conduct a review. Additionally, the Sheriff stated that he was sorry for all that the Elizabeth was going through. Defs.' Ex. D, 112: 4–6.

Elizabeth thanked the Sheriff for his concern, and stood. According to Elizabeth, Sheriff Daniels then came around the table and hugged her. The hug lasted about a second. *Id.* at 112:11–16. Surprised by the embrace, Elizabeth stepped away from the Sheriff and moved towards the closed door. The Sheriff opened the door and guided her out by putting his hand on the small of her back, with his fingers extending over the top of her buttocks. *Id.* at 122: 20–25; 124: 1–25; 123: 1–5. Elizabeth stated that the Sheriff's hand remained there for a second. *Id.* at 125:6–10.

### 5. Elizabeth's Leave of Absence

On Monday, November 24, 1997, Elizabeth returned to the Sheriffs Department to speak to the Sheriff to request a leave of absence, Defs.' Ex. D, 182:3–10; 184:9–25, in order to deal with the stress caused by her son's being charged with aggravated sexual assault. Defs.' Ex. B, 10:3–9. She did not return to the office until late February, 1998.

### 6. Elizabeth's Charges of Sexual Harassment

On February 20, 1998, plaintiff gave her immediate supervisor, Sergeant Leo Vanderbilt, a letter containing her allegations of sexual harassment based on the September 2nd and November 17th events. Sergeant Vanderbilt immediately referred the letter in accordance with departmental policies. It was the first time Elizabeth complained of the incidents to the authorities in spite of the sexual harassment training she received while employed by the County and during her military service.

Elizabeth's letter immediately set into motion the procedures by which such

claims are investigated. In approximately three months' time, the New Jersey Attorney General's Office concluded a thorough investigation of Elizabeth's sexual harassment complaint and issued a "Final Report." Defs.' Ex. 58. Based on that report, Debra L. Stone, the Acting Prosecutor, determined that "after a lengthy and detailed investigation, weighing the testimony of all parties and witnesses and all other evidence, we have found the allegations by Sheriffs investigator [Elizabeth Stefanoni] to be lacking in credibility and unsubstantiated." Defs.' Ex. 59. The prosecutor further noted that "even if Elizabeth [Stefanoni's] description of the two incidents were credible, the acts complained of do not constitute criminal sexual contact or sexual harassment. They amount to accidental touching and a touching of the back." Defs.' Ex. 59. The Attorney General's Office also issued a "Supplemental Report" investigating Elizabeth's retaliation claims against Undersheriff Stanfield. Defs.' Ex. 60. The prosecutor found the retaliation claims similarly unsubstantiated.

On May 27, 1998, the County informed Elizabeth that the Attorney General's Office's Division of Criminal Justice had completed its investigation and found that the allegations of sexual harassment and retaliation were lacking in credibility and unsubstantiated. Defs.' Ex. 62.

### 7. Charges of Misconduct Against Plaintiffs

While the prosecutor did not find merit in Elizabeth's claims, the investigation uncovered evidence of misconduct by both Elizabeth and Zachary. In her summary of the report, Prosecutor Stone noted Elizabeth's "exceptionally poor police work." Prosecutor Stone also stated that, although not the focus of the investigation, there was a "discrepancy in the hours put on [Elizabeth's] time sheet and the hours actually worked on at least one occasion." Defs.' Ex. 59. The prosecutor "strongly suggest[ed] that [the Sheriff's Department] institute an audit of her time and that of Sergeant [Zachary] Stefanoni." Defs.' Ex. 59.

Per the prosecutor's recommendation, the Sheriff's Department instituted an audit of the plaintiffs. The audit yielded evidence of unprofessional conduct and policy violations. The violations included engaging in secondary employment, reporting sick in order to engage in secondary employment, abuse of telephonic and cellular telephone equipment, and unauthorized use of the county building.

The audit resulted in the County bringing twenty-nine charges against both plaintiffs. Elizabeth was charged with:

(1) Incompetency and inefficiency or failure to perform duties; (2) Chronic or excessive absenteeism or lateness; (3) Conduct unbecoming a public employee; (4) Neglect of duty; (5) Misuse of public property; (6) Violation of office policy regarding the use of cellular phones; (7) Unauthorized use of cellular phones; (8) Entering a county building for other than investigative work; (9) Inappropriate use of sick time; (10) Failure to submit a doctors note as is required by departmental policy; (11) Submission of false over time records and telephone calls; (12) Inappropriate use of county telephone; (13) Failure to reimburse the county for personal calls; (14) Falsification of requests for military leave.

Defs.' Ex. 28. The County charged Zachary with:

(1) Incompetency, inefficiency or failure to perform duties; (2) Chronic or excessive absenteeism or lateness, (3) Conduct unbecoming a public employee; (4) Neglect of duty; (5) Misuse of public property; (6) Violation of office policy

regarding use of cellular phone; (7) Unauthorized use of cellular phone; (8) Entering the county building for other than investigative work; (9) Inappropriate use of sick time: (10) Failure to submit a doctor's note as is required by departmental policy; (11) Submission of false overtime records and telephone calls; (12) Inappropriate use of county telephone; (13) Failure to reimburse County for personal calls; (14) Violation of departmental policy concerning outside employment; (15) Reporting for secondary employment while calling out sick. Defs.' Ex. 26.

In July, 1998, a County Hearing Officer sustained the charges against plaintiffs. Defs.' Ex. H, 213:10–13. As a result, Burlington County terminated Elizabeth and Zachary from the Sheriff's Department, effective July 21, 1998. Defs.' Exs. 25, 97.

By that time, however, Elizabeth had effectively resigned. After finally reporting to work in late February, she functioned in the courts division until June, 1998, at which time she was temporarily assigned to the Burlington County Office of Consumer Affairs. There is evidence that this assignment complied with Elizabeth's request for a light duty assignment, which she requested in order to deal with pregnancy complications she was experiencing. Defs.' Ex. 81. Elizabeth reported to the Office of Consumer Affairs on June 22nd and 24th, but did not return thereafter. *Id.*

After their termination, the plaintiffs filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Defs.' Exs. 56, 100 On March 19, 1999, the EEOC issued a Notice of Right to Sue to both Elizabeth and Zachary. Defs.' Ex. 103. Thereafter, plaintiffs filed their sexual harassment and retaliation suit in this Court.

### C. The Summary Judgment Opinion

At the conclusion of discovery, defendants moved for summary judgment. This Court granted the defendants' motion, holding that Elizabeth "fell far short" of making out a *prima facie* case of sexual harassment under either a hostile work environment or *quid pro quo* theory, as those theories are recognized under both Title VII and the NJLAD. Elizabeth could not make out a *prima facie* hostile work environment case because the seven instances of sexual harassment of which she complained were not pervasive or severe. Of the seven allegations, five were compliments from Sheriff Daniels concerning her hair or perfume. The remaining two instances of harassment consisted of accidental physical contact, each of which lasted no more than a second.

The Court found Elizabeth's *quid pro quo* claims of sexual harassment equally devoid of merit. Plaintiffs' attorney failed to allege a coherent theory of *quid pro quo* liability linking defendants' employment decisions to plaintiff's refusal to submit to the alleged harassment. Indulging plaintiff, this Court considered every employment decision made by the defendants with regard to Elizabeth. First, contrary to her allegations, the return of Elizabeth's firearm could not be the basis of *quid pro quo* liability, because Sheriff Daniels, the alleged harasser, did not have a role in that decision. Rather, return of her firearm was in the discretion of the County Prosecutor's office. Furthermore, examination of the facts surrounding Elizabeth's transfers within the Sheriff's Department, and finally, her termination, demonstrated that the defendants made these decisions based on nothing more than her poor performance and judgment.

Finally, the Court dismissed plaintiffs' retaliation claims because they failed to

establish a causal link between Elizabeth's sexual harassment complaint and plaintiffs' termination. The process that led to their termination was initiated at the recommendation of the Attorney General's Office, and not the defendants. In addition, the Court found that, even if the plaintiffs could have carried their initial burden, the defendants put forth non-discriminatory business justifications for their termination of Elizabeth and Zachary; namely, the twenty-nine charges sustained against them, and no credible evidence of pretext was raised.

### D. Analysis

■ Under the *L.B. Foster* factors, the Court finds that plaintiffs' claim were without foundation and unreasonable, and thus frivolous. First, plaintiffs failed to make out a *prima facie* case of either sexual harassment or retaliation. Second, it appears that plaintiffs made settling the case an impossibility by refusing to negotiate from their initial settlement demand of $1,000,000. Aff. of Michael P. Madden, Esq., ¶ 18. In addition, plaintiffs' claims did not survive defendants' motion for summary judgment.

■ Furthermore, the Court finds that plaintiffs' action was unreasonable in light of the determinations made by the Attorney General's Office and the County Hearing Officer. Awards of attorney's fees may be proper where "the plaintiff is aware with some degree of certainty of the factual or legal infirmity of his claim," or "where a plaintiff proceeds in the face of unambiguous previous adverse ruling." *Badillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1163–4 (7th Cir.1983); *Sek v. Bethlehem Steel Corp.,* 421 F.Supp. 983 (E.D.Pa.1976) (finding plaintiff's claims unreasonable, in part, because the Pennsylvania Human Relations Commission and the EEOC found his claims baseless); *Eich-*

*man v. Linden & Sons, Inc.,* 752 F.2d 1246, 1250 (7thCir.1985) (noting that plaintiff was on "questionable grounds in proceeding with his lawsuit" after the Illinois Human Rights Commission dismissed his complaint); *Sierra v. Datapoint Corp.,* 459 F.Supp. 668 (W.D.Tex.1978) (awarding fees and costs to Title VII defendant where the plaintiff knew at the time of her discharge that she had been terminated for her own misconduct and where discovery failed to produce any relevant evidence other than her own testimony). In this case, the investigating prosecutor labeled Elizabeth's sexual harassment claims unsubstantiated and legally insufficient. In addition, a County Hearing Officer upheld the twenty-nine charges upon which plaintiffs' termination was based after an administrative hearing. These decisions made plaintiffs fully aware of the factual and legal infirmities of all their claims prior to bringing suit in this Court.

Based on the foregoing, the Court finds defendants are entitled to reasonable attorney's fees because plaintiffs' case was frivolous.

### E. Reasonableness of Fees Requested

■ A reasonable fee is one which is adequate to attract competent counsel, but which does not produce windfalls to attorneys. *Public Interest Research Group of New Jersey, Inc. v. Windall,* 51 F.3d 1179, 1185 (3d Cir.1995); *Local Union No.1992 v. Okonite Co.,* 34 F.Supp.2d 230, 234 (D.N.J.1998). The starting point for determining the reasonableness of a fee is to calculate the "lodestar amount." *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This is the number of hours reasonably expended multiplied by a reasonable hourly rate. *See id.*

■ A "reasonable hourly rate" is one commensurate with the rates charged

by lawyers of similar skill, experience and reputation in the relevant community. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir.2001). A court is required to assess the experience and skill of the prevailing attorneys and compare their rates to those of their peers; the hourly rate is to be assessed on an individual basis. *Id.* at 184 (citing *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990)). The attorney's usual billing rate is a good starting point for determining a reasonable hourly rate, but this figure is not dispositive. *Id.*

 The party requesting fees bears the burden of demonstrating that the request is reasonable. *See Rode*, 892 F.2d at 1183; *Local Union No.1992 v. Okonite Co.*, 34 F.Supp.2d 230, 234 (D.N.J.1998). The Court cannot decrease a fee award based upon factors not raised at all by the adverse party. *See Rode*, 892 F.2d at 1183. However, the court has discretion to adjust the award once specific objections to the fee application are raised. *Ernesto v.*

*Rubin,* No.Civ.A.97–4683, 2000 WL 682644, at *5 (D.N.J. Mar.21, 2000).

Plaintiffs' counsel has put forth nothing more than a general denial of defendants' entitlement to attorney's fees. Plaintiffs have not made any specific objections concerning the time counsel spent on the case, the rates that were charged, or any particular duplicative or unreasonable time entries. Therefore, this Court will endeavor to determine the reasonableness of the attorney's fees.

 Defendants incurred $90,309.64 in attorney's fees and costs in defending this matter. Approximately $13,020.14 are costs associated with service of process, copying and depositions. Review of the record substantiates those costs, and the Court finds they were reasonably incurred in pursuit of this litigation. As to the attorney's fees, the billing rates for the attorneys, law clerks and paralegals who worked on this matter are set out in the affidavit of Michael Madden, Esq., and its exhibits, as follows:

| INDIVIDUAL | POSITION | HOURLY RATE | HOURS WORKED |
| --- | --- | --- | --- |
| Michael P. Madden, Esq. | Partner | $125.00 | 290.0 |
| Patrick J. Madden, Esq. | Partner | $125.00 | 10.9 |
| Heather L. Azoulay, Esq. | Associate | $110.00 | 316.9 |
| Peter J. Lucca, Esq. | Associate | $110.00 | 15.7 |
| Michael V. Madden | Law Clerk | $ 35.00 | 22.7 |
| Matthew P. Madden | Law Clerk | $ 35.00 | 31.0 |
| Joseph Gentlesk | Paralegal | $ 25.00 | 63.2 |
| Anthony Gentlesk | Paralegal | $ 25.00 | 1.5 |

Defendants submitted a detailed account of tasks performed and the time each task took to complete. A review of the time records submitted by counsel demonstrates that the amount of time spent was reasonable under the circumstances. Review did not yield duplicative hours. Moreover, it appears that the litigation's tasks were properly delegated; individuals were assigned tasks commensurate with their experience and billing rate. Furthermore, counsel achieved all of the relief sought—complete dismissal of all claims against the defendants.

 The Court declines to reduce the lodestar for work completed in the defense of the NJLAD claims because division of hours would be futile. Where a civil rights

action involves several different claims centered on a common core of facts or legal theories, it is difficult to divide counsel's hours on a claim-by-claim basis because much of counsel's time is generally devoted to the litigation as a whole. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Instead, courts are to "focus on the significance of the overall relief obtained" for the purpose of determining the lodestar. *Id.* In the present case, the defendants achieved all of the relief sought. Furthermore, all claims were premised on the very same set of facts and cannot be distinguished. Therefore, the Court will not reduce the lodestar because the complaint included claims other than Title VII claims.

The Court further finds the hourly billing rate of each person who worked on the case to be reasonable in the relevant market of public sector litigation. The foregoing rates are consistent with rates billed by attorneys of similar experience and skill. *See Murphy v. Housing Authority and Urban Redevelopment Agency of the City of Atlantic City,* 158 F.Supp.2d 438, 454 (D.N.J.2001) (finding rates for attorneys of up to $175 per hour reasonable). Therefore, there will be no rate reduction in the lodestar calculation.

 However, the Court will reduce the lodestar calculation for work dedicated to the appeal. On October 11, 2001, Michael P. Madden worked 0.70 hours on "Correspondence to Evan H.C. Crook, Esquire, telephone conference with Evan C. Crook, Esquire, review all documents from Third Circuit, memo to Patrick Madden, Esquire." Aff. of Michael P. Madden, Ex.

1. Because it appears Mr. Madden spent this time on the defense of the appeal, the court will deduct $87.50 from the total award. Defendants can move for fees and costs incurred in connection with the appeal at the appropriate time.

## III. CONCLUSION

For the reasons stated herein, the Court grants defendants' application for attorney's fees and expenses in the amount of $90,222.14. This sum represents the amount requested by defendants ($90,-309.64) minus the sums billed for work on the appeal of this matter ($87.50).[6]

## ORDER

Before the Court is an application by defendants, Board of Chosen Freeholders County of Burlington, Burlington County Sheriff's Department, and Gary L. Daniels, Sheriff of Burlington County, for attorney's fees and costs. Plaintiffs filed opposition. In accordance with the Court's opinion filed herewith,

It is on this ___ day of January, 2002

ORDERED that defendants' application is GRANTED. Plaintiffs shall reimburse defendants for fees and costs in the amount of $90,222.14.

---

**6.** The amount defendants request is actually $318.50 less than the amount to which the Court's lodestar calculation determines defendants are entitled. However, the Court will award defendants $90,222.14 as the plaintiffs are not prejudiced by an award that is less than what the defendants may be entitled too, and because the defendants only request that amount.